**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United State of America, | ) | |
| | ) | No.  CR-17-08070-001-PCT-DLR |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | August 7, 2017 |
| Camille Lomaomvaya, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

**SENTENCING**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                       **A P P E A R A N C E S**

2

For the Plaintiff:

3
     U.S. Attorney's Office
4    By:  Alexander W. Samuels, Esq.
              Dimitra Sampson, Esq.
5    40 North Central Avenue, Suite 1800
     Phoenix, Arizona 85004
6
For the Defendant:

7
     Federal Public Defenders Office
8    By:  Milagros A. Cisneros, Esq.
              Rekha Nair, Esq.
9    850 West Adams Street, Suite 201
     Phoenix, AZ 85007
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

1

2          THE COURTROOM DEPUTY:  Criminal Case No. 17-8070,

3     United States versus Camille Lomaomvaya, on for sentencing.

4          Counsel, please announce for the record.

5          MR. SAMUELS:  Good morning, Your Honor.  Alexander

6     Samuels and Dimitra Sampson for the United States.

7          THE COURT:  Good morning.

8          MS. CISNEROS:  Good morning, Your Honor.  Milagros

9     Cisneros and Rekha Nair on behalf of Ms. Lomaomvaya.

10         THE COURT:  Good morning.

11         There's a matter we probably should handle in a closed

12    session before we get started.  So I'm going to have to ask

13    members of the -- whoever's in the courtroom to please step

14    outside just for a moment.  We have -- I have a matter I have

15    to deal with the parties that needs to be in closed session.

16         (Sealed proceedings held on the record contained in a

17    separate sealed transcript.)

18         THE COURT:  Okay.  Are we ready to proceed?

19         MS. CISNEROS:  Yes, Your Honor.

20         THE COURT:  Would you approach the podium, please.

21         Would you please state your name and date of birth.

22         THE DEFENDANT:  Camille Lomaomvaya.  5/31/2000.

23         THE COURT:  We need to take a short break.  I've got

24    one last thing I need to review.  Hang on a second.

25         (Brief recess taken.)

1          THE COURT:  You have entered into a plea agreement.

2     You pled guilty before a magistrate judge -- excuse me, you

3     pled guilty before me, and your plea has been accepted.

4          There having been a determination of guilt by a plea

5     of guilty, it is the judgment of the Court defendant is guilty

6     of Carjacking Resulting in Death (Aiding and Abetting), in

7     violation of 18 USC Section 2119(3) and Section 2119(2), a

8     Class A felony.

9          I've read and considered the presentence report.  Have

10    counsel reviewed it?

11         MR. SAMUELS:  Yes, Your Honor.

12         MS. CISNEROS:  Yes, Your Honor.

13         THE COURT:  And, Ms. Cisneros, did you review it with

14    your client?

15         MS. CISNEROS:  I did.

16         THE COURT:  Ma'am, have you reviewed the presentence

17    report with your attorney?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Do you understand the presentence report?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  The Court accepts the plea agreement, and

22    the judgment and sentence will be consistent with it.  I am

23    satisfied that the plea agreement adequately reflects the

24    seriousness of the actual offense behavior and that accepting

25    the agreement will not undermine the statutory purposes of

1   sentencing or the sentencing guidelines.  The binding range

2   departs from the applicable guideline range for justifiable

3   reasons.

4           Using the guidelines as a starting point, the Court

5   finds the applicable offense level is 40, the applicable

6   criminal history category is I, and the applicable ranges are

7   as follows:  292 months to 365 months incarceration, two to

8   five years supervised release, 50,000 to $500,000 fine,

9   restitution is mandatory, defendant is ineligible for

10  probation, and there is a $100 special assessment.

11          The Court has previously made a determination that

12  defendant qualifies for a one-level downward departure pursuant

13  to United States Sentencing Guidelines Section 5K.  Making that

14  adjustment, that brings the offense level to 39.  That coupled

15  with a criminal history category of I --

16          MS. CISNEROS:  Apologize, Your Honor.

17          THE COURT:  No problem.

18          MS. CISNEROS:  We can go on, Your Honor.

19          THE COURT:  Okay.  Thank you.

20          An offense level of 39 coupled with a criminal history

21  category of I results in a guideline incarceration sentencing

22  range of 262 months to 327 months.

23          Are there any additional comments or objections from

24  counsel on those determinations?

25          MR. SAMUELS:  No, Your Honor.

1          MS. CISNEROS:  No, Your Honor.

2          THE COURT:  In addition to the presentence report, I

3     have read and considered defendant's sentencing memorandum and

4     request for downward variance and the attachments, including

5     the sentencing video and letters in support of the defendant; I

6     reviewed the United States' sentencing memorandum, as well as

7     the victim impact statement.

8          Ms. Cisneros, is there something you would like to say

9     in your client's behalf before sentence is imposed?

10         MS. CISNEROS:  Your Honor, we do have a presentation

11    with individuals who want to speak on my client's behalf.  I

12    don't know if you would prefer for us to do that first.  I

13    would certainly -- I think that would be appropriate from our

14    perspective, so...

15         THE COURT:  Okay.  Let's do that.

16         MS. CISNEROS:  Okay.  Thank you, Judge.

17         THE COURT:  And, Ms. Cisneros, I reviewed the video,

18    but the volume was difficult to hear in some places so I

19    couldn't hear everything.

20         MS. CISNEROS:  Oh, I'm sorry.

21         THE COURT:  But I heard most of it.

22         MS. CISNEROS:  Okay.  Thank you, Judge.

23         THE COURT:  Good morning, ma'am.  Would you state your

24    name, please.

25         MS. PAULITA LOMAOMVAYA:  Good morning.  My name is

1    Paulita Lomaomvaya.  I'm the mother of Camille Lomaomvaya.

2              THE COURT:  Okay.

3              MS. PAULITA LOMAOMVAYA:  It's a very difficult

4    morning, as you might imagine.

5              THE COURT:  Yes, ma'am.

6              MS. PAULITA LOMAOMVAYA:  As a mother, I love my

7    daughter.  I was blessed to have her.  I was blessed for her to

8    come into this world to me.  Like I said in my letter, I will

9    never understand how it got to this point, but we are here and

10   it's something that I have to accept, my daughter has to

11   accept.  And at this point, we have accepted.

12             I pray for the strength for everyone involved in this

13   tragic event.  I know death.  And although my daughter is still

14   here, still alive, I feel like the daughter that I raised is

15   gone.  But I pray.  I pray for the healing for the victim's

16   family, but especially for my daughter.

17             And whatever sentence you give her, we'll be -- we'll

18   be as strong as we can to accept it and to help her through

19   this.  She is not a bad person.  She is not.  She has a good

20   heart.  And I want her to know that.  And I wouldn't be here

21   right now pleading from the bottom of my heart to you and

22   hoping that you believe me.

23             Because I know my daughter.  I know her.  I love her.

24   And I will be right there with her, whatever sentence you give

25   her.  And I will wait as long as it takes for her to come home.

1   Because that's how important she is to me, because that's how

2   much I believe in her, in her strength.  I believe with the

3   bottom of my heart she will do good.  She deserves that chance

4   to prove herself.

5          She was young, as we all were.  I don't believe she

6   even realized what was happening, but I don't want to make

7   excuses.  We're here now, and that's the fact.  We are here

8   right now.

9          But I want you to know she's a good person.  She will

10  do good if you give her that chance.  Don't send her away for

11  more than is needed.  Because she needs to do good in this

12  world, and I know she can.  She will.

13         Standing here before you, I can't think of everything

14  I wanted to tell you.  But I hope you know how much she means

15  to the family.  There are many more family that couldn't be

16  here.  But I want her to know that they all send their love and

17  their strength for her.  And they will all be waiting because

18  that's how much we believe in her.  That's how much we love

19  her.

20         I just pray for healing.  I pray for healing for

21  everyone, and I don't believe that giving her a long sentence

22  is really going to do any good for anyone.  What we all need is

23  healing.  And I pray for the family that is here today, and I

24  pray that they understand that from a mother's perspective,

25  that she deserves a chance to prove herself.  I love her, and

1    I'm trying to be strong here for her.

2           She's a good person.  She really is.  And all those 15

3    years should not be wiped away by one bad, bad, bad mistake.

4    She needs healing.  I pray that you understand she needs

5    healing.  She needs counseling.  If she don't have me -- and I

6    pray, I pray, I'm here to welcome her home.

7           But my heart aches, and it will ache till the day she

8    comes home.  And that's because that's how I see my daughter.

9    She's a good daughter.  She's a good sister.  She's a good

10   granddaughter.  If you knew her before this, you would know.

11   You would know that I -- why I plead to you.  That's the

12   Camille we know.  That's who we know.

13          I hope you -- I pray that you have the wisdom to make

14   the right choice for us and for her.  Because it is a life, and

15   it's a very young life.  But we're prepared.  I stand by her,

16   and I will stand by her.

17          Thank you.  Thank you.

18          THE COURT:  Thank you, ma'am.

19          Good morning, sir.

20          MR. MICAH LOMAOMVAYA:  Good morning.  (Speaking Native

21   language.)  Good morning.

22          My name is Micah Lomaomvaya.  I'm the father of

23   Camille Bree Lomaomvaya.  And we are from the Village of

24   Shungopavi on the Hopi Indian Reservation, Second Mesa.

25          I want to thank the honorable judge and the members of

1    the court for giving us this opportunity to speak on behalf of

2    our child.

3            We are in an unfamiliar place, an unfamiliar setting.

4    I want to acknowledge that all the families involved here are

5    from the same community, and we all suffer during this tragic

6    event, and it's something that we can never foresee, especially

7    when we all raise our children with the high standards of Hopi

8    values and culture.  And many themes, including (speaking

9    Native language), which means to support and care for one

10   another as a community.

11           I've been fortunate to have a family, as you can see.

12   Fortunate to have a career in anthropology, where I serve my

13   people throughout my career, in natural and cultural resources

14   management.

15           In doing so, I've been able to use my education to

16   raise my family in this setting, in this place where I grew up

17   initially as a young boy and saw the values and the resources

18   that my people have enjoyed for hundreds and thousands of

19   years.  And always wanted my children to be a part of that

20   tradition and that heritage that links us to the past and our

21   early ancestors.

22           The Hopi religion and the Hopi culture are part of who

23   we are.  My children have been raised thoroughly throughout

24   this through their learning, through their values, through

25   their interactions with society and the community as well as

1    the religion and being able to be raised and understand how

2    valuable life is, how valuable our lives are, and how we can

3    all benefit by working together and supporting each other.

4         And I've tried to instill this in my children, my wife

5    and I, and their grandparents have also supported this

6    tradition and that's how they have been raised.

7         Camille, (speaking Native language), as I know her, my

8    family knows her, the fruit maiden, came into this world and

9    she was, like all four of our children, a great asset, a great

10   gift, as we believe in Hopi that we choose to be born into this

11   way of life.  And for her to have chosen us as her parents was

12   something that we really, really valued and were honored and

13   gave her the upbringing, the education, the opportunities that

14   she could, and she took those opportunities to be a positive

15   member of the -- of our family, of the community.

16        She excelled in the classroom.  She excelled in

17   sports.  She excelled in the community.  She excelled in and

18   participated in our cultural events.  And it's a dream come

19   true for me as a father to see her being raised that way, to

20   see all of her brothers and sisters being raised that way, a

21   member of our larger extended clan families, being a part of

22   that and enjoying what we have to offer in the Hopi way of

23   life.

24        I think as she's grown up, we've seen her blossom.

25   We've seen her grow.  She's always been positive, always

1    focused on achieving her best, doing her best.  And we've

2    supported her through that.

3          My family, as a father's family, we provide her

4    guidance and support throughout that; the mother's clan being

5    there for every little need she has and nurturing and raising

6    her.

7          And this unfortunate event, this tragic event, has

8    affected all of us.  And as my wife has said, we're trying to

9    heal from it.  And in the process of healing, we know that as

10   youth, they are guided in many different ways, many different

11   decisions, and sometimes they aren't prepared for those

12   decisions.  And one way or another, those good and bad

13   throughout even our own life experiences have an affect on our

14   future and how we develop as adults into old age and how we

15   experience our life.

16         But I ask the Court and the prosecutor who are making

17   decisions on her future to have that in mind.  She has proven

18   herself to be a positive member of this tribe, a positive

19   member of this community.  And we're there to support her,

20   whichever direction, whatever sentence is provided by the

21   Court.

22         But we do know that she has proven herself as a

23   positive member of this community, as a light within our

24   family, and our future as a family, and we hope that the Court

25   does not -- or takes that into consideration, that she has been

1   a positive member of this community and that we look forward to

2   supporting her.

3          And although we have to accept what terms and

4   conditions are handed down by the Court, we'll be there.  We've

5   been there all this time.  We've been visiting her as much as

6   we can.  And wherever she goes, we're going to be there with

7   her in spirit.  Whether we write to her, visit her, call her,

8   talk to her, we'll continue to provide her that guidance that a

9   Hopi way of life can.

10         And so from her grandparents, her extended family, her

11  clans, we wish and accept and plead to the Court that you have

12  some leniency and mercy on her, as you have mercy on us and our

13  community by providing her back to us when that is over.

14         Thank you.  Thank you for your time.

15         THE COURT:  All right.  Thank you.

16         Good morning.

17         MR. TREVOR LOMAOMVAYA:  Good morning.

18         THE COURT:  Your name, please?

19         MR. TREVOR LOMAOMVAYA:  My name is Trevor Lomaomvaya.

20  I am the brother to Camille Lomaomvaya.

21         So as my whole -- as my entire family knows, this very

22  unfortunate event was -- doesn't really make sense to all of

23  us.  We are all praying for her strength as -- to our own

24  family and as well as to the victim's families.

25         I've known Camille for all of my life.  I grew up with

1    her when she was born.  My father and my mother, they have

2    always raised and cared for us right.  We were raised in a very

3    caregiving environment.  And as I've been able to grow up with

4    Camille, I've seen all of their very positive and good

5    qualities in her.

6            And this very tragic event wasn't something I would

7    have expected of her and her future.  I would have seen her to

8    be very successful, very -- very caring.  And this major

9    setback in her life was something we didn't really want her to

10   go through.

11           As I've grown up, I've made some bad -- bad mistakes.

12   But these mistakes were able to get me back on track and see

13   what more I could accomplish, and I was able to grow from it.

14   So I see this as something that she can grow from.  She won't

15   be able to make the same mistake again, and that she go on

16   living a better life.

17           Because as we all know, we have grown, and some of us

18   badly, some mistakes.  But we have grown to make better of

19   ourselves, and I just pray that she is -- she is given a light

20   sentence and that she is able to see her future goals come to

21   life.

22           But I pray for the healing for the victim's family and

23   our family as well, as well as the community.  Because we have

24   all lost something in this.  So that's what I pray for.

25           And I have -- I wasn't around when this happened.  I

1   wish I was, because I was -- I was focused on myself.  I went

2   away from -- for school, and I wasn't able to watch her like I

3   used to.  But I think that if she was given the right guidance

4   from my peer level, that she'll be able to -- she would have

5   been able to get on the right track again.

6          So I just -- I wanted to say that because I wasn't

7   able to write a letter.  And just for you to know that I am --

8   I am with her and I'm very close to her, so I know her as a

9   person.  And I just pray that she is given a chance.  And I

10  love her very much.  I just want her to know that.

11         Thank you.

12         THE COURT:  Thank you.

13         MS. CISNEROS:  We have one more person, Your Honor.

14         MR. STANFORD LOMAKEMA:  Good morning.

15         THE COURT:  Good morning.

16         MR. STANFORD LOMAKEMA:  My name is Stanford Lomakema.

17  I'm Camille's grandfather.

18         It's really unfortunate the things, the event that

19  happened that brought us here today.  And I also -- I also have

20  lost a dear one, my son, when she was -- when he was 10 years

21  old.  Taxicab driver ran over him, so, you know, it hurts a lot

22  to lose a family member.  And it takes years to heal from it.

23  And I sympathize with the victim's, you know, family.

24         Also, I am a clan relative of the family that -- you

25  know, that this lady came from.  And so we're -- you know, and

1  we do things, you know.  We have -- Hopis, we have a lot of

2  traditional things that still go on.  We have our ceremonies,

3  and we have our doings in the kivas where we work with each

4  other.

5       And it is difficult to maintain that kind of

6  relationship, close relationship with them.  And I'm sure that

7  we will eventually, you know, put this behind.  It's a tragic

8  event, no doubt about it.

9       And -- but the things that I have to say about my

10 granddaughter is that when she was young, we lived together --

11 we lived near each other, so our homes are just like few feet

12 apart.  And all of our grandchildren -- there's four of them.

13 Trevor that just spoke is the oldest, Camille is next, we have

14 another girl that's after her, and then we have a young boy.

15 His name's Chance.

16       They come to our house every day.  And we -- they come

17 home from school.  They're there -- we're there for them.  And

18 they grew up fine, in a loving home.  And this kind of thing

19 that happened, it's just -- I still couldn't believe it myself,

20 how this could have, you know, come about.  And I still grieve

21 about that.

22       You know, for my granddaughter too, that we miss her.

23 You know, been with us all these years and she's been -- like

24 the father said, she's excelled in different things.  Never

25 knew that anything was going to happen like this.

1          But she's got -- she's still young.  Still got a long

2     ways to go.  And I can't take anything that had happened back.

3     It did, and we know about it.  We accepted it.  And I just

4     wanted to pray that the length of sentencing and whatever

5     hopefully is such that she can get off sooner than later and

6     that she can pursue the dreams that she has.

7          She does have a good vision for the future for

8     herself.  I have a daughter that's got disabilities.  She's a

9     mental retard.  And she -- I wanted to build her a little place

10    where she can sell, you know, some things.  I call it Cassie's

11    Soup Pot.  And the plans that we had was that Camille would be

12    the manager for her so that she can do that.

13         Now, basically, that's put on hold.  And Camille's

14    vision is to become some sort of a -- well, she plans to go to

15    school later on for hospitality and for -- you know, to help

16    her out.

17         But thank you for the opportunity to speak, you know,

18    to you and before the Court.  And not much I can say more, you

19    know, but thank you very much.

20         THE COURT:  Thank you.

21         MS. CISNEROS:  Your Honor, my client would like to

22    address the Court next.

23         THE COURT:  Okay.

24         MS. CISNEROS:  Thank you, Judge.

25         THE DEFENDANT:  Hello.  First of all, I just want to

1    say sorry for all the pain I've caused.  I'm really, really

2    sorry.  I hope the family can heal too.

3            And I just want to say, too, that I've changed back to

4    the person I once was.  And I take full responsibility for the

5    choices I have made.

6            And, again, I'm really, really sorry.  I hope the

7    family can heal from all of this.  Thank you.

8            THE COURT:  All right.  Thank you.

9            Ms. Cisneros?

10           MS. CISNEROS:  Thank you, Your Honor.

11           We've heard a lot of discussion this morning about

12   healing.  And so I do want to focus a little bit on that in

13   what I say to the Court.

14           I think that you have -- you have indicated that you

15   received the sentencing memorandum.  I don't want to belabor

16   the point regarding how we got here, but I think it's important

17   to mention it again.  Because I believe that to the extent that

18   anything good would come out of this entire incident and

19   everything that has gone on, it's that healing can happen and

20   it can occur.

21           Camille needs to heal regarding what happened to her.

22   And you are familiar with those circumstances.  We have shared

23   them with you.  She disclosed those circumstances to treatment

24   providers, and that circumstance was investigated.  And

25   unfortunately for her, in her own healing process, that is

1    still an ongoing problem.

2         But I think that to the extent that the Court should

3    consider rehabilitation and the likelihood that anything like

4    this were to ever happen again, and to the extent that the

5    Court would consider mercy as a part of rehabilitation, I think

6    it's important to note that my client is -- and her family,

7    because this is a community, as you know.  And you've also

8    heard it's a small community, actually.  And you have also

9    heard that her grandfather is a clan relative of the victim's

10   family.

11        That in order to move forward, that the Court should

12   also exercise mercy and consider what Camille has gone through

13   in her young life, who she was before anything happened to her,

14   when she was 13 years old -- and I've provided plenty of

15   information about that -- and what she has done since she has

16   been in custody.  As you know, she obtained her GED.  She

17   obtained a CPR certificate.  She helped out with Head Start

18   schools in Pinal County.  She's a very talented person.

19        And one of the things that I personally have learned

20   in this process has been that this family, embedded in their

21   culture, looks forward.  And they at no moment have thought

22   that this was the end of anything.  And this is a continuation

23   of life, and it is -- they have high expectations, continue to

24   have high expectations for Camille, who is now a young woman.

25   She was 15 at the time of the commission of the offense.  She

1   was almost 16 years old.  She was young.  You know the

2   circumstances having to do with the way in which she found

3   herself involved with negative peers, if you will.

4        She has had a lot of time to reflect on those things

5   and to return.  As her mother said, she's somebody who's lost

6   her way.  She's found her way back.

7        And so, Your Honor, there is nothing that we can say

8   here that will bring Ms. Talayumptewa back.  Nothing Camille

9   can do to bring her back, as much as she, with every fiber of

10  her being, would go back to that day and prevent that from

11  happening.  Today, with 20/20 hindsight, she would do that,

12  absolutely.

13       But I think the Court can make something positive out

14  of these tragic, tragic circumstances.  My client understands

15  she has to be punished for this.  She knows that.  She

16  understands that.  She apologizes sincerely to the people that

17  are here in this side of the courtroom.

18       But she hopes that in the tradition that binds them

19  all together and that the Court will see that healing is

20  critical and that she, who is -- has a good soul at heart, that

21  you can help her heal by letting her go back to her community

22  and to her family as quickly as possible and that she can go

23  back to doing good in the world.  Because she has the capacity

24  to do it, and because she very much wants to do it.

25       So you know what our request is, Your Honor.  We ask

1    that you take into consideration the circumstances that led to

2    this offense with regards to my client.  We ask that you take

3    into consideration the tremendous support she has from her

4    family, from friends in the community.

5            You have seen those letters.  They're beautiful and

6    really express a deep knowledge and understanding of her as a

7    human being.  This is not just, you know, your typical letter

8    that says, yes, I know her and she's a good kid.  I mean, these

9    were testaments, really, to a deep knowledge and understanding

10   of this person who lost her way.  But she has come back, and

11   she is coming back.  And she wants to come back to her

12   community as quickly as possible.

13           So our request, Your Honor, is for the 12 years, which

14   is a long time for a young person.  We've discussed with her,

15   both Ms. Nair and I have discussed with her, the challenges she

16   will experience in custody and how she needs to make sure that

17   she seeks out employment, that she seeks out positive peers

18   even within the system when she does go to an adult prison

19   eventually.

20           But she is now back in touch with her family, really,

21   and she's returned.

22           Thank you, Your Honor.

23           THE COURT:  All right.  Mr. Samuels.

24           MR. SAMUELS:  Thank you, Your Honor.

25           Excuse me.  With the Court's permission, there are a

1  number of members of the victim's family who would like to

2  speak before I do, so...

3          THE COURT:  Yes.

4          MR. MATTHEW NASAFOTIE:  Good morning.

5          THE COURT:  Good morning, sir.

6          MR. MATTHEW NASAFOTIE:  I'm Matthew Nasafotie.  I'm

7  grandson of Florine Talayumptewa.

8          This -- ever since this happened, it took a big toll

9  on the family and myself especially.  Not just mentally, and

10  physically also.

11          It's hard to see someone else going through this on

12  the other side of the table.  But on our side of the table, we

13  don't -- we miss our grandmother, our sister, our mom, a

14  friend.  And it really affects us.  Like, unimaginably.  I

15  never seen this coming from even the other side of the table.

16          I really don't know where to start with my grandma.

17  She's a great person to meet in general.  She's funny, you

18  know, always has a good sense of humor.  And, you know,

19  sometimes she has the best advice.  And ever since we lost her,

20  you know, it's kind of -- it's kind of like my whole family's

21  been kind of lost, honestly.

22          At first it was pointing fingers at everybody, saying,

23  you should have been there.  You should have done this.  And

24  really, it kind of had everybody at each other's throats for a

25  while.  And it was none of our fault, and for her to be gone

1    like this is just, like -- like I said, we feel lost.  Or I
2    feel lost.
3          It's like everything -- anytime I had a problem or
4    just wanted to say something off my mind, I had my grandma and
5    I was able to tell her the blunt truth of anything I was doing.
6    And now it kind of seems like I had that mentor figure out of
7    my life, like she was like basically the stalk of our tree.
8    And now it's just like we're just kind of laying there and
9    trying to get back up, and it's really hard.
10         I can't -- there's so many things that really get to
11   me in everyday life that I really can't do anymore, from going
12   to work to seeing a certain color that reminds me of her.  It
13   hurts deeply.  And I really -- I really don't see the justice
14   of 12 years for my grandma.  We don't get to see her at all no
15   more.
16         We can't go -- the fondest memory we have of her is
17   of, you know, memories in our mind and pictures.  But we can't
18   go back and we can't see her.  We can't hold her or tell her
19   how her grandchildren are doing or -- you know, we can't even
20   take care of her no more.  And she's getting older.  That's the
21   one thing that really gets to us, you know?
22         There are certain things in life that, you know,
23   humans are made to do.  You know, we're made to love each other
24   and be with each other all the time, and you know, make things
25   count.  Make every little thing count.  And, you know, every

1   little thing that she's not here that she can't do, it hurts.

2   Like, we can't go to family dinners without my grandma no more.

3   And there's just certain places I can't go to at all, because

4   it hurts.

5          And we haven't been able to even, you know, have

6   counseling or anything with our whole family except for sitting

7   down with each other, but that's something that, you know, we

8   weren't offered in this process.  It's something that I feel

9   should have been offered to the family in this process.

10          Because this isn't easy to take for any of us.  And

11  this isn't easy for either side.  But for me, "sorry" doesn't

12  bring my grandma back, honestly.  And that's one thing that

13  really gets to me, is that I hope that the Court can consider

14  an extension of more than 12 years.  Because that's way

15  undergoing for me.

16          And for my grandma, like my grandma wasn't worth 12

17  years or even a second.  My grandma's life is her own.  And

18  it's a shame that she didn't have the decision or anyone else

19  to keep moving forward.

20          That's all I have to say.

21          THE COURT:  Thank you.

22          MR. RUBEN SAUFKIE:  (Speaking Native language).  Good

23  morning, everyone.

24          THE COURT:  Good morning.

25          MR. RUBEN SAUFKIE:  My name is Ruben Saufkie Sr.  I'm

1    the nephew of Florine Talayumptewa.

2          I'm touched by what my nephew had said, and of course,

3    unfortunately, we're all here today on behalf of my mom, you

4    know.  And it's affected all of us, everyone that was part of

5    this.  And of course, yes, we do come from a small village.  We

6    all know one another.  We're all connected in some way to one

7    another.

8          And I hear the comments that were made of life.  And

9    it is an unfortunate thing, you know, that the young ones has

10   done.  And I'm sitting back there and thinking, you know, they

11   have a long way to go also.  But this will be always looming

12   within them.  And in our culture, when we take life, as all of

13   us as humanity are pretty aware of, you never come back from

14   that.

15         And I'm sitting there, and when this thing happened,

16   I've been thinking how can we possibly positively learn from

17   this?  Well, one thing, it's made us come together.  And what

18   my nephew said, you know, they really haven't had any

19   counseling and healing and it will take time.  A long time.

20   And we possibly never, ever heal from this.

21         We, as a family, ask that whatever the maximum allowed

22   by the law will be granted.  Because as young as they are, they

23   will continue to live their life.  And unfortunately, my mom is

24   no longer here.

25         But in that time of healing, you know, I hope we as

1   the families that are all affected by this and the community

2   will hopefully learn from this.  And it's easy to say that we

3   must also find the compassion to forgive.  It's very easily

4   said, but it's one of the most hardest things to do.

5        So I hope as family members, on behalf of our

6   children, on behalf of my mother, there's no way else but

7   forward to learn from this tragic event, that I hope it can

8   bring some healing to all of us involved and have a positive

9   effect on our whole community of where we come from and where

10   we live at.

11        Myself, personally, I have compassion.  And I sit here

12   and I listen and I feel for the family.  But to hear my nephew

13   speak, you know, it's -- it's very touching because they will

14   never see their grandmother again.  They will not know her as

15   how we knew her also too.

16        So I hope you take that into consideration, Your

17   Honor.  I know there's more that I want to say, but I thank you

18   for your time.  And I know you'll make the right choice.

19   (Speaking Native language.)

20        THE COURT:  Thank you.

21        MS. JUDITH NAMOKI:  Good morning.  Good morning,

22   everyone.  My name is Judith Namoki.  I am Florine's niece.

23   She's also, in the Hopi way, a mother.

24        I just want to thank all of you guys for your efforts

25   in the process that it takes to come to this point of the

1   hearing.  I appreciate everyone's emotions involved.

2       I just want to say that I've heard a lot about these

3   young people being good people, having a good soul, doing good

4   in life.  Unfortunately, we all, as -- at the age of about 2 or

5   3, know the difference of right and wrong, and most of us, the

6   consequences that go along with the decisions that we might

7   make in time.  In each and every day, there are thousands of

8   decisions that we make as individuals that impact our lives

9   negatively or positively because each action holds a

10  consequence.

11      And I just want to let these children, these young

12  adults, remind everyone as adults that that is true.  Every day

13  we make decisions that impact our lives as well as others.

14      And having said that, these individuals knew exactly

15  what they were doing.  When they ask for mercy and leniency,

16  where was that mercy and that leniency while they were

17  committing this horrendous act?  This gruesome brutality that

18  they inflicted on another person, willingly, knowingly,

19  consciously.

20      And then to backtrack and say that in one year of

21  time, that they are now okay, they are now willing to go

22  forward, they're willing to have a beautiful life and make good

23  decisions, no.  I think that you need to -- one year of

24  reflection is not enough to grasp the whole understanding of

25  how you've impacted so many people's lives, including yourself

1    as a young person.  You've not only impacted your family's

2    hurting, you've taken a person away from this world that is no

3    longer breathing.  No longer able to love.  No longer able to

4    smile.  You still have all those physical abilities to do so.

5            Every day to wake up, every day to see your loved ones

6    and to talk to them, the chance to even have children.  What

7    you have done to yourself is unforgivable.  What you've done to

8    anybody else, our aunt, is unforgivable.

9            I leave you with this:  That just understand that no

10   matter how you raised your child, that child, as an individual,

11   took somebody else's life.

12           And I ask the Court that you prosecute these young

13   people for the maximum, because our aunt is never coming back.

14   She will never smile.  She will never make another decision

15   again on this day of life, on this earth, which you have a

16   choice to do so from here on out.

17           A lot of people are -- my nephew, as one, has been

18   very greatly negatively impacted emotionally, physically,

19   mentally.  And I do believe that it would behoove the Court to

20   offer some counseling for this family.  Because it is very

21   traumatic, and that entails some other harm that goes on

22   that -- harm that you cannot see.  The killing of one soul, not

23   only did you kill somebody physically, you killed a lot of

24   people here in their heart.  And that's going to take a

25   lifetime to get over with.

1          I have sympathy, but only because of the fact that you

2    made the decision to impact your life as well as ours.  So with

3    that, I just -- I sympathize with your family.  I don't

4    sympathize with you, because you had a conscious decision to

5    make.  So many times from knocking on that door to whatever

6    happened during that day, there were so many decisions that you

7    could have made that could have thwarted any kind of further

8    action.

9          So it's just -- it's just very hard to live with the

10   decisions they made that day, those children that did have a

11   bright future, that did, you know, have a loving soul and all

12   that.  And all that right now are just words, because I look at

13   the actions that took place that day.  And there was no heart.

14   There was no soul.  There was no positivity.  There was no good

15   role model.  There was no good upbringing during that whole

16   time of the committance of that crime.

17         So I just hope that we, as a community, can heal.  I

18   also believe that once they do get released, once their time is

19   up, that they don't be allowed back into the community.

20   Because to be Hopi, you just cannot take somebody's life and

21   call yourself a Hopi.  That is very against Hopi.

22         And once they are released, I do believe that they

23   should not be going back, taking part in ceremonies and all

24   that, because that is -- that is not just a given.  That's a --

25              THE COURT:  It's a privilege.

1          MS. JUDITH NAMOKI:  That's a privilege, exactly, to

2    partake in these customs.  And if you have already broken the

3    code of Hopi, then you should no longer come back to the

4    community or serve or try to do in any kind of traditional

5    practices, because that in and of itself is not Hopi.

6          And back in the old days, back in the old culture of

7    Hopi, they used to -- you know, a life for a life.  If you take

8    a life, then you're taken into that plaza and you're stoned to

9    death, you know.  And I don't know if it's fortunate or

10   unfortunate that that is no longer the custom.

11         Sometimes, you know, us as individuals probably have

12   those angers and resentments that wish that that still went on

13   like that, but this is 2017, and unfortunately the laws have

14   changed, but the barbaric acts and the psychosis still remains

15   that people will murder and kill and will have no reason

16   whatsoever to do it.

17         But I thank you guys all for your time and your

18   energy, and I just pray for the families involved that they

19   can -- we can all heal from this.  But for those people that

20   committed these acts, I -- I just say, shame on you.  And I

21   hope that you live with this decision for the rest of your

22   life, whether or not you change, because my aunt does not have

23   that privilege.

24         THE COURT:  Thank you.

25         MS. JUDITH NAMOKI:  Thank you so much.  Have a great

1   day.

2          THE COURT:  Good morning, ma'am.  Would you state your

3   name, please.

4          MS. ROSEMARY TALAYUMPTEWA:  Good morning, Your Honor.

5   My name is Rosemary Talayumptewa.  I'm Florine's sister.  We

6   come from a large family, eight siblings, to be exact.  Now

7   only seven of us remain, with our dear sister Florine being

8   taken from us in an inhumane way by these coldhearted monsters,

9   whom have no respect for human kindness and human life,

10  especially the innocent elderly woman.  They all deserve to be

11  where she's at at the moment.

12         We, the remaining family of Florine, would like to ask

13  you, Your Honor, that these monsters do definitely need to be

14  punished for committing such a hideous brutal crime to this

15  woman who had her life ahead of her and for her and her

16  grandchildren as well.

17         My sister Florine was a very lovable, responsible,

18  giving person.  Not only that, she was also a friend to many,

19  many people who miss her.  Miss her smiles.  Her laughs will

20  greatly be missed by all who've known her.

21         If these monsters can do a brutal crime to an elderly,

22  they can as well do to anyone else.  I ask myself daily why and

23  what drove these monsters to do such a hateful brutal crime,

24  and why my sister.

25         Florine's daughter, Rose, is the only survivor.  She

1    herself has five children and six grandchildren, and whom all

2    reside in Flagstaff.  Their visits were quite frequent with

3    their mom there.  But it's now -- visitations has lessened

4    since my sister is not there to greet their arrivals.

5         Florine's grandchildren have been so traumatically

6    traumatized by the heinous, brutal crime that has been put upon

7    us all by these monsters, heartless monsters.  Some of us

8    family members have actually become ill, myself included.

9         But thanks to our spiritual healer who had the great

10   power to heal people, I've been healed.  As for one of

11   Florine's grandsons, Matthew, has not been too fortunate due to

12   missing his grandma so terribly.  He has come to terms of

13   trying to get his grandmother by committing several suicides,

14   several times.  But thanks to the Creator, he has something

15   very important in store for him.

16        Amongst the financial expenses that Florine's

17   daughter, Rose, has to acquire to this senseless crime, she now

18   as well is burdened by leaving, by being so stressed out

19   knowing that her son may do it again, which we hope and pray

20   that he gets stronger.

21        Your Honor, we received letters from -- we've received

22   letters from the attorneys that read "conspiracy to commit

23   murder," which is very infuriating.  A slap in the face.  So

24   therefore, my question is, whom is charged with murder?  My

25   sister Florine has been brutally slaughtered by these monsters,

1    coldhearted animals.  And were these animals to be in

2    conspiracy, then why is my sister not here?

3            Imagine this, everyone.  You and your siblings arrive

4    in a mortuary and seeing your loved one laying there on a cold,

5    hard table, with no clothes and no blanket to stay warm.  And

6    you walk up and see the most horrifying sight ever and see --

7    and see the damage that has been sustained upon her.

8            Terrible monsters.  This is so heartbreaking.  Never

9    have I thought that something like this horrible would come to

10   one of us, and no one should.  This shouldn't happen to any

11   human being.

12           Therefore, Your Honor, under these circumstances, we,

13   the family of Florine, ask that you take our letters and words

14   into your deepest consideration, and sentence these senseless,

15   mindless monsters the maximum penalty that the Court endures.

16   They are a danger to society, should not walk the earth, as my

17   sister cannot.  And she's also incarcerated so people will be

18   safe.

19           And I myself now live in the house where Florine

20   lived, which is only 50 feet away from a person who did most of

21   the stabbings.  Only 50 feet away, Your Honor.  And I ask the

22   Court when she is -- and hopefully not -- if she is ever

23   released, I would rather not have her live right across from

24   me.  It's a scary feeling.

25           From the start when she was still not incarcerated and

UNITED STATES DISTRICT COURT

1    I lived in there, not all knowing when is she going to come

2    back.  Because from what has been told, she's not done yet.

3           So I ask you, take our letters and speeches into

4    deepest consideration.  Thank you, Your Honor.

5           THE COURT:  Thank you.

6           MS. ROSE TALAYUMPTEWA:  Good morning.

7           THE COURT:  Good morning.

8           MS. ROSE TALAYUMPTEWA:  Good morning, Your Honor.  My

9    name is Rose Talayumptewa, daughter of Florine.  I'm the only

10   child of her, and she has six grandkids and five

11   great-grandkids, and this is the hardest thing for me.

12          She was my only parent my whole life, and she was

13   taken from me.  I'm sorry.  This is so hard.

14          I feel sorry for the family too.  But this is the

15   hardest thing I ever had to go through in my whole life.  She

16   was always there for me:  financially, physically, mentally.

17   And right now I don't have anybody that close to lean to, and

18   it's really hard.

19          My kids and me, we're -- it's so hard.  I had one son,

20   he was so upset with what was going on, he almost tried to kill

21   himself because he wanted to be with his grandma.  He was 8.

22   That isn't right.  Now he's 10.  He even said he wanted to do

23   the -- be with his grandma like that, and it was so hard for me

24   to hear my little boy say stuff like that.

25          It's so hard.  Just seeing my mother laying on the

1    table like that was -- for someone to brutally do that to her,

2    murder my own mom, I can't even -- I can't even take care of

3    her when she gets older no more.

4         MR. SAMUELS:  Your Honor, I believe that's all we have

5    from the family, and I'd like a chance to speak myself.

6         THE COURT:  Okay.

7         MR. SAMUELS:  Frankly, Your Honor, there's probably

8    nothing I can say that would be much more compelling than what

9    you've just heard.

10        I'd like to start by thanking the family for being

11   here and for their words today and for their involvement

12   throughout this process.  They've been remarkably involved.  I

13   think, frankly, they're all quite lucky to have each other in

14   this.  It's clear that this terrible event has brought them

15   together, and they were already a close-knit family.  And so I

16   hope they know how lucky they are to have each other.

17        But with that said, Your Honor, this is obviously an

18   unusual case, it's obviously a tragic case, and it's obviously

19   a heartbreaking case.

20        We filed a memorandum with the Court, and the Court is

21   aware of our sentencing recommendation.  But I would like to

22   speak briefly to that recommendation in light of the guidelines

23   and in light of the 3553(a) factors this Court needs to

24   consider.

25        The sentence we've recommended is obviously

1  significant, but this is a crime warranting a significant

2  sentence.  And frankly, had the defendants in this case been

3  adults, if any plea agreement had been offered, it would have

4  been drastically harsher than the plea agreement that was

5  offered here.

6         And so we have recommended a sentence that is

7  significantly less than what an adult would have faced.  We

8  think that's appropriate.  I think the defendant is absolutely

9  right and her family is right to point out her youth, to point

10  out her immaturity, and to point out all of these things.  And

11  we believe our sentencing recommendation takes all those things

12  into account.  It varies downward from the guidelines.

13         And setting the guidelines aside, this is a case in

14  which there was clear evidence of first degree murder and

15  carjacking resulting in death.  And so had she been an adult,

16  this defendant would have faced either a mandatory life

17  sentence or a possible death sentence.

18         And so even imposing a sentence towards the maximum

19  allowed under this plea agreement, this defendant would receive

20  a substantial consideration for the fact that she was a

21  juvenile at the time.

22         Now, the way that the 3553(a) factors weigh here, I

23  think no one would disagree.  Obviously, the history and

24  characteristics of this defendant weigh towards giving her some

25  sort of break.  And the nature and circumstances of this

1   offense and many of the other factors weigh significantly

2   towards imposing the harshest sentence available.

3          I would like to speak, as it relates to the need to

4   impose just punishment, to afford adequate deterrence, and to

5   reflect the seriousness of the offense, briefly about not just

6   the impact that this crime has had on the victim's family but

7   on the Hopi community at large.  Because although I think Your

8   Honor has a lot of information in front of you, I think that's

9   one thing that was probably not covered.

10         The Hopi Reservation is obviously a small community.

11  Your Honor, I personally handle most of the felony prosecutions

12  out there, and I'm out on the reservation for various sorts of

13  meetings usually at least once a month.  And what I can tell

14  you is, from the day that this happened last May, I have had

15  almost zero meetings in which someone didn't ask me about this

16  case.

17         And that includes members of law enforcement, social

18  services, the schools, elected tribal leaders, the tribal

19  council, everybody I meet with.  The general counsel of the

20  tribe.  I have been in victim meetings on other cases with

21  folks where we're talking about a crime where someone has

22  suffered, someone is a victim, and they go out of their way in

23  that meeting to ask me about this case.

24         And it's because this crime has really had an enormous

25  effect in the Hopi community.  It has been relayed to me by

1    many people as the most heinous crime that has been committed

2    in that community in years.  And I think the facts demonstrate

3    that that's likely true.

4            And therefore, in light of all of this, and the need

5    to protect the public from future crimes of this defendant, we

6    think a significant sentence is warranted.  We do not think a

7    12-year sentence would be just under the circumstances or would

8    accomplish these purposes.

9            And, Your Honor, the last thing I'd like to note is I

10   watched the video this morning that the defendant put together

11   with her family, which I thought was very well done.  But one

12   thing she said in that video really jumped out at me, and I

13   wrote it down.  She said:  Instead of being a leader, I allowed

14   myself to be a follower.

15           And I understand the point she was trying to make

16   there, but I would like to make a slightly different point,

17   Your Honor, which is when it came to this crime, this defendant

18   was very much a leader.

19           She was not the one who actually stabbed this victim,

20   but she was the one who was pushing the planning of this crime

21   forward.  She began exchanging messages planning this crime in

22   March.  And a few days before this crime was actually

23   committed, on May 24th, she was the one encouraging her

24   codefendant, Ms. Soohafyah, to go commit this crime on her own.

25   And I'd like to read some of her words that day.

1          She said:  Just go to that door -- this is from this

2    defendant to Ms. Soohafyah.

3          Just go to that door.  Open it and grab her around the

4    head with whatever weapon you got.

5          And three days later, that's exactly what this

6    defendant did.

7          She went on:  Tell her what's up and drop her off like

8    in the back of the Towers.  Make it quick and tell her to hurry

9    the F up.

10          She encouraged Ms. Soohafyah to get a Glock, if she

11    could, and if she couldn't, to use a knife.  And she sent a

12    picture of the knife that three days later was used to kill

13    this victim.

14          This defendant said:  Tell her to go to the ATM and

15    take all her money out.

16          She said to get all the cash, and she encouraged

17    Ms. Soohafyah to do these things.  She said:  If you're gonna

18    kill her, empty out her whole bank account and anything else in

19    her house.

20          Obviously, there are a lot of mitigating circumstances

21    to consider here, Your Honor, but I would ask Your Honor not to

22    lose sight of the offense conduct here and not to lose sight of

23    this sort of thing.  Ms. Soohafyah ultimately did not commit

24    that crime on May 24th, and so this defendant went and

25    recruited a third juvenile, who was not involved, two days

1    later.  And the three of them, with really this defendant

2    acting as the instigator, went and committed this horrendous

3    crime on May 27th of last year.

4          And so I would ask Your Honor to consider that and

5    consider everything in front of you.  And with that, I don't

6    have anything to add, unless you have any questions, Your

7    Honor.

8          THE COURT:  Okay.  Well, thank you.

9          MR. SAMUELS:  Thank you.

10         THE COURT:  Ms. Cisneros, would you approach the

11   podium, please, with your client?

12         MS. CISNEROS:  Yes, Your Honor.

13         THE COURT:  Pursuant to the Sentencing Reform Act of

14   1984, it is the judgment of the Court that Camille Bree

15   Lomaomvaya is hereby committed to the Bureau of Prisons for 192

16   months.

17         The defendant shall pay a special assessment of $100,

18   which shall be due immediately.  The Court finds defendant does

19   not have ability to pay and orders the fine waived.

20         While incarcerated, payment of criminal monetary

21   penalties is due during imprisonment at a rate of not less than

22   $25 per quarter, and payments shall be made through the Bureau

23   of Prisons Inmate Financial Responsibility Program.

24         Criminal monetary payments shall be made to the Clerk

25   of the U.S. District Court, Attention Finance, Suite 130, 401

1   West Washington Street, SPC 1, Phoenix, Arizona.

2           Payments should be credited to the various monetary

3   penalties imposed by the Court in the priority established

4   under 18 USC Section 3612(c).  The Court hereby waives the

5   imposition of interest and penalties on any unpaid balance.

6           Mr. Samuels, is there a restitution amount in this

7   case?

8           MR. SAMUELS:  We do not have a restitution request at

9   this time, Your Honor, but there may be something coming.  I

10  just spoke with the family, and they may have a request.  But

11  we'll talk with defense counsel about that afterwards and --

12          THE COURT:  Okay.

13          MR. SAMUELS:  -- notify the Court.

14          THE COURT:  I'm going to leave restitution open then.

15          MR. SAMUELS:  Yes.  Thank you, Your Honor.

16          THE COURT:  Should we set a hearing?

17          MR. SAMUELS:  We can set a hearing if Your Honor would

18  like.

19          THE COURT:  Yeah, I want to do that.  We'll do that

20  when I get finished with this.

21          Upon release from imprisonment, defendant shall be

22  placed on supervised release for 36 months.  While on

23  supervised release, the defendant shall comply with the

24  conditions of supervision as adopted by this Court in General

25  Order 16-23.  Of particular importance, the defendant shall not

1    commit another federal, state, or local crime during the term

2    of supervision.

3           Within 72 hours of release from the custody of Bureau

4    of Prisons, the defendant shall report in person to the

5    probation office in the district to which she is released.

6           The defendant shall comply with the following

7    additional conditions:

8           You shall participate as instructed by the probation

9    officer in a program of substance abuse treatment, which may

10   include testing for substance abuse.  You shall contribute to

11   the cost of treatment in an amount to be determined by the

12   probation officer.

13          You shall abstain from all use of alcohol or alcoholic

14   beverages.

15          You shall participate in a mental health program as

16   directed by the probation officer, which may include taking

17   prescribed medication.  You shall contribute to the cost of

18   treatment in an amount to be determined by the probation

19   officer.

20          You shall comply with the standard condition of

21   supervision requiring full-time employment at a lawful

22   occupation.  This may include participation in training,

23   counseling, and/or daily job searching as directed by the

24   probation officer.

25          If not in compliance with this condition of

1    supervision, you may be required to perform up to 20 hours of

2    community service per week until employed as approved or

3    directed by the probation officer.

4          You shall submit your person, property, house,

5    residence, vehicle, papers, or office to a search conducted by

6    a probation officer.  Failure to submit to a search may be

7    grounds for revocation of release.  You shall warn any other

8    occupants that the premises may be subject to searches pursuant

9    to this condition.

10          You shall not contact the family of the victim, and

11   the probation officer will verify compliance.

12          This has been a very terrible tragedy, and it brought

13   all the people here down from the Hopi Reservation for a very,

14   very difficult and uncomfortable day in federal court.  No one

15   wanted to be here.  And we saw some courageous people stand up

16   today and tell me what they had to say.

17          It was very courageous, heartfelt expressions of

18   sadness and grief from both sides, and it's just a tragedy to

19   hear.  It's a tragedy for me to even have to be involved in

20   this case myself.

21          I've varied downward considering -- well, first I

22   considered the unusually heinous, cruel, brutal, and

23   degrading-to-the-victim crime and the fact that it involved

24   gratuitous infliction of pain and injury.  This is just a

25   tragedy.

1           But I varied down considering the age of the victim,

2    her history as a victim herself, her family support, and her

3    remorse.

4           The Court finds this sentence to be sufficient but not

5    greater than necessary to comply with the purposes set forth in

6    18 USC Section 3553(a).

7           The Court finds this sentence to be reasonable

8    pursuant to that statute considering the nature and

9    circumstances of the offense, the history and characteristics

10   of the defendant, the need to reflect the seriousness of the

11   offense, promote respect for the law, provide a just

12   punishment, afford adequate deterrence, and protect the public

13   from further crimes of the defendant.

14          The Court adopts the facts as set forth in the

15   presentence report in support of the guideline calculations and

16   the reasons for the sentence.

17          Ma'am, do you understand the sentence that's just been

18   imposed?

19          THE DEFENDANT:  I do.

20          THE COURT:  Counsel, have I sentenced defendant in

21   accordance with the terms of the plea agreement?

22          MR. SAMUELS:  Yes, Your Honor.

23          MS. CISNEROS:  Yes, Your Honor.

24          THE COURT:  I find I have sentenced defendant in

25   accordance with the terms of the plea agreement.

1              Ma'am, what that means for you is this:  Pursuant to

2    your plea agreement, you agreed that you would waive the right

3    to appeal if I sentenced you within the terms of that

4    agreement, except for the right to challenge the effectiveness

5    of the assistance of your counsel or any governmental

6    misconduct.

7              Had you not waived the right to appeal, you would have

8    14 days from today to file a notice of appeal, and you would

9    have the right to have counsel represent you on the appeal at

10   no cost to you if you could not afford counsel.  Do you

11   understand?

12             THE DEFENDANT:  Yes, I do.

13             THE COURT:  Mr. Samuels, is there a motion?

14             MR. SAMUELS:  Yes, Your Honor.

15             Actually, Your Honor, I think because the juvenile

16   pled to an adult information, to the extent the juvenile

17   information is still out there, we'd move to dismiss it.

18             THE COURT:  Okay.  That's granted.

19             I'm also going to recommend that the defendant be

20   placed by BOP in the 500-hour residential drug abuse program.

21             Have we covered everything?

22             MS. CISNEROS:  Your Honor, I think we had also

23   requested a recommendation for placement here in our district.

24             THE COURT:  Okay.

25             MS. CISNEROS:  Obviously, because she's very close to

1    her family and she's so young.

2         THE COURT:  Okay.  I can't tell the Bureau of Prisons

3    what to do, but I will make that recommendation that she be

4    housed in or near Arizona.

5         Okay.  We'll stand in recess.

6         MS. CISNEROS:  Thank you, Your Honor.

7         MR. SAMUELS:  Thank you, Your Honor.

8         THE COURT:  Oh, hang on a second.  We need to set that

9    restitution hearing.

10        THE COURTROOM DEPUTY:  We can set that September 8th

11   at 3:30.

12        THE COURT:  September 8 at 3:30.

13        Ms. Cisneros, do you want to check and see if your

14   client would be willing to waive her appearance at that hearing

15   if she --

16        MS. CISNEROS:  Yes, Your Honor.  I will check with her

17   right now.

18        THE COURT:  Okay.

19        (Conference off the record between Ms. Cisneros and

20   the defendant.)

21        MS. CISNEROS:  Yes, Your Honor.  She'll waive her

22   presence.

23        THE COURT:  Okay.  All right.  We'll stand in recess.

24        (Proceedings concluded.)

25

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 21st day of April,

13   2020.

14

15

16
                         s/Jennifer A. Pancratz_____ _____ ____
17                       Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25